**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| JILL SCHLUETER and ROBERT SCHLUETER, | ) ) ) | |
| Plaintiffs, | ) ) | CASE NO._____ |
| v. | ) ) ) | **COMPLAINT AND DEMAND** |
| 3M COMPANY, a Delaware Corporation, and ARIZANT HEALTHCARE, INC., a Delaware Corporation, | ) ) ) ) ) | **FOR JURY TRIAL** |
| Defendants. | ) | |

## COMPLAINT

Plaintiffs, Jill Schlueter and Robert Schlueter, by and through their attorneys, GOLDENBERG HELLER & ANTOGNOLI, P.C., bring this action against Defendants 3M Company (3M) and Arizant Healthcare, Inc. (Arizant) (hereinafter referred to collectively as "Defendants"), for injuries caused by Defendants' design, development, testing, assembling, manufacturing, packaging, promoting, marketing, distribution, supplying and/or selling the defective device sold under the trade name of Bair Hugger Forced Air Warming device (hereinafter referred to as "Bair Hugger" or Defective Device").

## PARTIES

1. Plaintiff, Jill Schlueter, is a resident and citizen of Belleville, Illinois, located in St. Clair County.

2. Robert Schlueter, the spouse of Jill Schlueter, is a resident and citizen of Belleville, Illinois, located in St. Clair County. Robert Schlueter claims damages as a result of loss of consortium.

3. Defendant 3M is a corporation organized and existing under the laws of the State of Delaware, with its principle place of business located in Maplewood, Minnesota. 3M is

Page 1 of 20

engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, supplying, selling, marketing and introduction into interstate commerce, either directly or indirectly through third parties o related entities, its products, including the Bair Hugger.

4. Defendant Arizant is a corporation organized and existing under the laws of the State of Delaware, with its headquarters located in Eden Prairie, Minnesota. Arizant conducts business throughout the United States, including the State of Illinois, and is a wholly owned subsidiary of Defendant 3M.

5. At all times relevant herein, Defendants were the agents of each other, and in doing the things alleged herein, each Defendant was acting within the course and scope of its agency and was subject to and under the supervision of its co-defendants.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over this action pursuant to 28 USC § 1332 insofar as the parties are citizens of different states and the amount in controversy in this matter exceeds Seventy-Five Thousand Dollars ($75,000), exclusive of interest and costs.

7. This Court has personal jurisdiction over Defendants and venue is proper within this district pursuant to 28 U.S.C. § 1391, as a substantial number of the events, actions, or omissions giving rise to the Plaintiffs' claims occurred in this district. Moreover, Defendants regularly solicited and engaged in business in this district. Defendants did (and do) business within the State of Illinois and have had substantial, continuous, and systematic contacts with the State of Illinois.

## FACTUAL BACKGROUND

8. The Defendants, directly, or through their agents, apparent agents, servants, or employees, designed, manufactured, marketed, advertised, distributed and sold the Bair Hugger.

9. More than 50,000 Bair Hugger units are currently in use across the country.

10. The Bair Hugger consists of a portable heater/blower connected by a flexible hose to a disposable blanket that is positioned over (or in some cases under) surgical patients. The system warms patients during surgery by blowing hot air on a patient's exposed skin.

11. The hot air produced by Bair Hugger accumulates under the surgical drape covering the patient and escapes from under the surgical drape below the level of the surgical table or at the head end of the surgical table. This escaped air creates air flow currents that flow against the downward air flow of the operating room. As this warmed air rises, it can deposit bacteria from the floor of the surgical room into the surgical site.

12. Upon information and belief, at some point between 2002 and 2009 the Defendants reduced the efficiency of the air filtration of Bair Hugger blowers. This action reduced the safety of such blowers.

13. As a result of these actions by the Defendants, the internal airflow paths of Bair hugger blowers can become contaminated with pathogens.

14. The contaminating pathogens incubate and proliferate within the internal airflow paths of the Bair Hugger blowers.

15. These pathogens are then expelled from the interior of the Bair Hugger blower by the outward airflow, travel through the hose into the disposable blanket and escape into the operating room.

16. Upon information and belief, the Defendants have been aware of the pathogenic contamination of the airflow paths of Bair Hugger blowers since at least 2009.

17. The Defendants have actively and aggressively marketed the Bair Hugger as safe in both general and orthopedic surgeries despite their knowledge to the contrary.

18. In June of 1997, in a letter to the Food and Drug Administration ("FDA"), the Defendants admitted that "air blown intraoperatively across the surgical wound may result in airborne contamination." The Defendants addressed this flaw in their products by making further misrepresentations to the FDA when they stated that the risk of contamination by air flow is obviated because all "Bair Hugger Blankets designed for use in the operating room feature a tape barrier which prevent [sic] air from migrating toward the surgical site." That statement by the Defendants was and is patently false. A number of Bair Hugger blankets marketed as safe for use in surgeries do not utilize a taped edge at all. Instead, those blankets blow contaminated air directly toward the surgical field. Also, the statement that the taped barrier would contain the contaminated air is false because it ignores the fact that the heated air from the Bair Hugger rises against the general downward airflow of the operating theatre. The presence of a tape edge does nothing to prevent the Bair Hugger from facilitating the movement pathogens from the floor of the operating room to the surgical site. When the Defendants made these representations, they had actual knowledge of their falsity.

19. In a communication to the FDA in September 2000, Defendants represented that the Bair Hugger's filtration system meets HEPA ("High Efficiency Particulate Air") Standards.

20. Upon information and belief, Defendants' September 2000 statement was false at the time Defendants made it and remains false today. To meet HEPA standards, an air filter must be capable of removing 99.97% of all particles 0.3 microns or larger. The filter of the Bair Hugger, which is marketed as HEPA compliant, is capable of removing at most 65% of all such particles.

21. On Defendants' website, www.fawfacts.com/laminar_airflow/ (last visited September 2, 2015), the Defendants make the following misrepresentations:

    a.    Contamination mobilized by the convection currents generated by the Bair Hugger cannot reach the surgical site because "[a]ir velocity within the operating room is many times stronger than that of a forced-air warming blanket".

    b.    "The air emerging from the blanket is directed downward by the surgical drape and emerges under the operating room table and is drawn away through the laminar system's return air inlets;"

    c.    "It's been suggested that warm air rising above the Bair Hugger blanket could interfere with the downward laminar flow toward the surgical site. It should be noted that the Bair Hugger warming nit delivers less than one percent of the airflow of a laminar flow system and the momentum of the downward air is far greater than the upward momentum imparted to the air above the blanket."

22. Upon information and belief, these statements on Arizant's website, itemized in the preceding paragraph, are false and intentionally misleading. Through these statements, the Defendants disguise the fact that the issue is not the strength of the airflow in a laminar system but the heat of the air generated by the Bair Hugger. The cold air circulated with the operating room, having a higher density than the air heated by the Bair Hugger, falls to the floor which forces the contaminated air at the floor of the operating room, now warmed by the waste heat from the Bair Hugger, to rise into the sterile field and the surgical site. The heated air rises, and is not "drawn away" as the Defendants falsely claim in their advertisement.

23. In an advertisement that appeared in multiple medical publications as early as 2010, available online at http://www.fawfacts.com/assete/zn062p/AJIC.pdf (last visited September 2, 2015), the Defendants made the following false and deliberately misleading claims:

> "While simple logic makes it clear that forced air warming has no impact on laminar conditions, science also supports this. A forced air warming blanket delivers less than one percent of the airflow of a laminar flow system and therefore is unable to affect laminar flow ventilation systems."

As published scientific research has demonstrated, this statement is untrue. The exhaust generated by the Bair Hugger creates convective airflow patterns which disrupt the laminar flow of the operating theater.

24. In a communication that appeared in Healthcare Purchasing News in July of 2012, the Defendants' public relations and communications specialist, Greta Deutsch, stated "some conductive-warming manufactures have alleged that forced-air warming increases bacterial contamination of operating rooms or interrupts laminar airflow. These accusations have no factual basis." Again, this statement ignores numerous published studies documenting the adverse effects the Bair Hugger has on laminar airflow.

25. The publication of numerous peer-reviewed studies identifying and documenting the critical safety shortcomings of the Bair Hugger should have prompted the Defendants to redesign or discontinue their product. Instead, those criticisms only caused the Defendants to amplify their efforts to champion the Bair Hugger. These publications include, but are not limited to, the following;

    a. Albrecht, M., et al. Forced-air warming blowers: An evaluation of filtration adequacy and airborne contamination emissions in the operating room. *Am J Infect Control* 2010; 39:321-8;

    b. Leaper, D., et al. Forced-air warming : a source of airborne contamination in the operating room? *Orthopedic Rev.* 2009;1(2):e28;

    c. McGovern, P.D., et al. Forced-air warming and ultra-clean ventilation do not mix. *J Bone and Joint Surg-Br.* 2011;93-B(11):1537-1544;

    d. Legg, A., et al. Do forced air patient-warming devices disrupt unidirectional downward airflow? *J Bone and Joint Surg-Br.* 2012;94-B:254-6;

    e. Belani, K., et al. Patient warming excess heat: The effects on orthopedic operating room ventilation performance. *Anesthesia & Analgesia* 2101 (prepublication on-line) 2013;117(2):406-411;

    f. Dasari, K.B., et al. Effect of forced air warming on the performance of operating theatre laminar flow ventilation. *Anaesthesia* 2012;67:244-249.

26. These misrepresentations mislead health care providers about the safety of the Bair Hugger for use in surgical procedures. The Defendants were aware of the falsity of their misrepresentations were authored.

27. Rather than alter the design of their product or warn physicians of the dangers associated with the Bair Hugger, as numerous studies confirm, the Defendants have chosen to "double down" on their efforts to promote their defective product.

28. Plaintiff's physicians relied upon the above representations and advertisements to Plaintiff's detriment. However, through misrepresentations to the public, the medical community and the FDA, the Defendants actively and knowingly concealed the propensity of these devices to cause infection in orthopedic implant surgeries.

29. As a result of the failure of the Defendants' Bair Hugger to maintain the sterility of the surgical area and the Defendants' wrongful conduct in designing, manufacturing, and marketing this defective product, Plaintiff and Plaintiff's physicians were unaware, and could not have reasonably known or have learned through reasonable diligence, that Plaintiff had been exposed to the risks identified in this complaint, and that those risks were the direct and proximate result of the defendants' acts, omissions and misrepresentations.

## PLAINTIFF'S SPECIFIC CASE

30. As a result of the defective design of the Bair Hugger, Plaintiff, Jill Schlueter, has suffered and may continue to suffer severe and permanent personal injuries.

31. On February 19, 2013, Plaintiff, Jill Schlueter, underwent a right total knee replacement, during which time, upon information and belief, a 3M Bair Hugger forced air warming blanket was used.

32. Subsequently, Plaintiff, Jill Schlueter, was diagnosed with a Methicillin-resistant Staphylococcus aureus (MRSA) infection. As a result of this infection, Plaintiff was forced to undergo a two-stage revision with the first stage occurring on September 25, 2013 for explant of the right knee prosthetic and the second stage occurring on April 17, 2014 for fusion of a prosthetic rod.

33. Plaintiff was also forced to undergo further treatment, including hospitalizations for insertion of PICC Line for IV antibiotics, skin grafts and blood transfusions, as well as extended home health care.

34. Because the Bair Hugger was used, contaminants were introduced to Plaintiff, Jill Schlueter's open surgical wound, resulting in a severe infection, multiple surgeries, permanent and ongoing injuries.

35. The Defendants concealed and continue to conceal their knowledge of the Bair Hugger's unreasonably dangerous risks from Plaintiff, Jill Schlueter, other consumers, and the medical community.

36. The Defendants failed to conduct adequate and sufficient post-marketing surveillance after they began marketing, advertising, distributing and selling the Bair Hugger.

37. As a result of the Defendants' actions and inactions, Plaintiff, Jill Schlueter, was injured due to the use of the Bair Hugger, which has caused and will continue to cause Plaintiff, Jill Schlueter, various injuries and damages. Accordingly, Plaintiffs seek compensatory damages.

## CAUSES OF ACTION

### COUNT I - NEGLIGENCE

38. Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

39. Defendants had a duty to exercise reasonable care when designing, developing, researching, manufacturing, marketing, supplying, promoting, packaging, selling and distributing the Bair Hugger.

40. Defendants failed to exercise ordinary care in the designing, developing, researching, manufacturing, marketing, supplying, promoting, packaging, selling and distributing

the Bair Hugger in that Defendants knew or should have known that using the Bair Hugger could cause significant bodily harm, including, but not limited to, physical injuries of a permanent and disabling nature, physical pain and mental anguish, diminished enjoyment of life, hospitalization and other medical expenses, loss of earnings and was therefore not safe for consumer use.

41. Defendants' negligent acts and/or omissions include, but are not limited to:

   a. Failing to properly and thoroughly test the Bair Hugger before releasing the device to market;

   b. Failing to properly and thoroughly analyze the data resulting from the pre-market tests of the Bair Hugger;

   c. Failing to conduct sufficient post-market testing and surveillance of the Bair Hugger;

   d. Designing, manufacturing, marketing, advertising, distributing and selling the Bair Hugger to consumers, including Plaintiff, Jill Schlueter, without an adequate warning of the significant and dangerous risks of the Bair Hugger and without proper instructions to avoid the harm which could foreseeably occur as a result of using the device;

   e. Failing to exercise due care when advertising and promoting the Bair Hugger; and

   f. Negligently continuing to manufacture, market, advertise and distribute the Bair Hugger after Defendants knew or should have known of its adverse effects.

42. Despite the fact that Defendants knew or should have known that Bair Hugger posed a serious risk of bodily harm to consumers, Defendants continued to manufacture and market the Bair Hugger.

43. Defendants knew or should have known that consumers, such as Plaintiff, Jill Schlueter, would foreseeably suffer damages as a result of Defendants' failure to exercise ordinary care as described above.

44. It was foreseeable that Defendants' product, as designed, would cause serious injury to consumers, including Plaintiff, Jill Schlueter.

45. As a direct and proximate result of the Defendants' negligence, Plaintiff, Jill Schlueter, suffered serious physical injury, harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

46. Defendants' conduct evidences a flagrant disregard of human life so as to warrant the imposition of punitive damages. This conduct includes, but is not limited to, the following: failing to adequately design, test and manufacture the Bair Hugger, and continuing to market and distribute the Bair Hugger when Defendants knew or should have known of the serious health risks it posed to consumers.

47. As a result of the foregoing negligent actions and/or omissions by Defendants, Plaintiff, Jill Schlueter, suffered injuries and damages alleged herein.

## COUNT II – NEGIGLENT MISREPRESENTATION

48. Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

49. Defendants made negligent misrepresentations regarding the Bair Hugger including, but not limited to, the following:

    a. Defendants represented through the labeling, advertising, marketing materials, seminar presentations, publications, notice letters and regulatory submissions that Bair Hugger has been tested and found to be safe and effective for the warming of patients during orthopedic implant surgery; and

    b. Defendants represented that Bair Hugger was safer than other patient warming systems.

50. Defendants made the foregoing representations without having reasonable grounds for believing them to be true. The representations made by Defendants were false, in that the Bair Hugger is not safe, fit and effective for human use.

51. The foregoing representations were made directly by Defendants, sales representatives and other authorized agents of Defendants, in publications and other written

materials that were directed to Plaintiff, Jill Schlueter, the general public and healthcare providers, with the intention of inducing reliance on the representations, thereby promoting the sale and use of the Bair Hugger.

52. Plaintiff, Jill Schlueter, and Plaintiff's physicians did, in fact, reasonably rely upon the representations. In the absence of the representations, the Bair Hugger would not be used in implantation surgeries such as the one at issue in this case.

53. As a result of Defendants' actions, omissions and misrepresentations, Plaintiff, Jill Schlueter, suffered severe bodily injuries and damages.

## COUNT III – FRAUD AND DECIET

54. Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

55. As a result of Defendants' research or testing, or lack thereof, Defendants blatantly and intentionally distributed false information, including, but not limited to, assuring Plaintiff, Jill Schlueter, healthcare providers and the FDA, that the Bair Hugger was safe and effective for use as a means to warm patients during orthopedic surgeries.

56. Defendants intentionally represented that the Bair Hugger has been tested and found to be safe and effective for the warming of patients during orthopedic implant surgery, and that the Bair Hugger was safer than other patient warming systems.

57. Defendants had a duty to disseminate truthful information to the general public, including Plaintiff, Jill Schlueter, and a parallel duty not to deceive the general public and Plaintiff, Jill Schlueter, as well as the Plaintiff's respective healthcare providers.

58. The information distributed by Defendants to Plaintiff, Jill Schlueter, the general public and healthcare providers contained false representations that Bair Hugger was safe and effective for use as a means to warm patients during orthopedic surgeries.

59. Defendants' representations were all false and misleading.

60. Upon information and belief, Defendants intentionally suppressed, ignored and disregarded test results not favorable to Defendants, and results demonstrating that the Bair Hugger was not safe as a means of warming patients during orthopedic surgeries.

61. Defendants' representations were made with the intent that healthcare providers and patients, including Plaintiff, Jill Schlueter, would rely upon them.

62. Defendants' representations were made with the intent of defrauding and deceiving Plaintiff, Jill Schlueter, other consumers and healthcare providers to induce and encourage the sale of the Bair Hugger.

63. At the time the representations were made, Plaintiff, Jill Schlueter, and/or Plaintiff's respective healthcare providers did not know the truth with regard to the dangerous and serious health and safety concerns associated with the use of the Bair Hugger.

64. Plaintiff, Jill Schlueter, did not discover the true facts with respect to the dangerous and serious health and safety concerns associated with the use of the Bair Hugger, nor Defendants' false representations regarding the same, nor could Plaintiff, Jill Schlueter, with reasonable diligence have discovered the true facts.

65. Plaintiff, Jill Schlueter, and Plaintiff's physician did in fact rely upon the representations. In the absence of Defendants' representations, the Bair Hugger would not be used in implantation surgeries such as the one at issue in this case.

66. Defendants' conduct was fraudulent and deceitful, and was committed willfully, wantonly and/or purposefully to induce Plaintiff, Jill Schlueter.

67. As a result of the foregoing acts and omissions, Plaintiff, Jill Schlueter, suffered serious physical injury, harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

## COUNT IV – BREACH OF EXPRESS WARANTY

68. Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

69. Defendants expressly warranted that the Bair Hugger was safe and fit for its intended purpose, that it was of merchantable quality, that it did not produce any dangerous side effects and that it was adequately tested. Defendants did not disclose the material risks that the Bair Hugger could cause severe and permanent injury.

70. Members of the consuming public, including consumers like Plaintiff, Jill Schlueter, and her healthcare provider, were intended beneficiaries of the warranty.

71. Plaintiff, Jill Schlueter, and her healthcare provider reasonably relied on Defendants' express representations pertaining to the Bair Hugger's purported safety.

72. The Bair Hugger did not conform to Defendants' express representations regarding its purported safety because it caused serious injury to Plaintiff, Jill Schlueter, when used as recommended and directed, and these risks were not disclosed to Plaintiff or her healthcare provider.

73. As a direct and proximate result of Defendants' breach of warranty, Plaintiff, Jill Schlueter, suffered serious physical injury, harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

## COUNT V – BREACH OF IMPLIED WARRANTY

74. Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

75. When Defendants designed, developed, manufactured, marketed, sold and/or distributed the Bair Hugger for use by consumers like Plaintiff, Jill Schlueter, and Plaintiff's

physician, defendants knew of the use for which the Bair Hugger was intended and impliedly warranted the product to be of merchantable quality and safe for such use.

76. Plaintiff, Jill Schlueter, and her physician reasonably relied upon Defendants' representations regarding the Bair Hugger's merchantable quality and that it was safe for its intended use, and upon Defendants' implied warranty.

77. Contrary to Defendants' implied warranty, the Bair Hugger was not of merchantable quality or safe for its intended use, because the product was defective, as described herein.

78. As a direct and proximate result of Defendants' breach of warranty, Plaintiff, Jill Schlueter, suffered serious physical injury, harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

## COUNT VI – STRICT PRODUCTS LIABILITY

79. Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

80. At all times herein mentioned, Defendants designed, developed, researched, manufactured, tested, advertised, promoted, marketed, sold and/or distributed the Bair Hugger which was used by Plaintiff, Jill Schlueter.

81. The Bair Hugger was expected to and did reach the usual consumers, handlers and persons coming into contact with said product without substantial change in the condition in which it was produced, manufactured, sold, distributed and/or marketed by Defendants.

82. At those times, the Bair Hugger was in an unsafe, defective and inherently dangerous condition, which was dangerous to users and, in particular, Plaintiff, Jill Schlueter, herein.

83. The Bair Hugger designed, developed, researched, manufactured, tested, advertised, promoted, marketed, sold and/or distributed by Defendants was defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of the Bair Hugger.

84. The Bair Hugger designed, developed, researched, manufactured, tested, advertised, promoted, marketed, sold and /or distributed by Defendants was defective in design or formulation in that, when it left the hands of the Defendants, it was unreasonably dangerous, and it was more dangerous than an ordinary consumer would expect.

85. At all times herein mentioned, the Bair Hugger was in a defective condition and unsafe, and Defendants knew or had reason to know that said product was defective and unsafe, especially when used in the form or manner as provided by Defendants.

86. Defendants knew, or should have known, at all times herein mentioned, their product was in a defective condition and was and is inherently dangerous and unsafe.

87. At the time Plaintiff, Jill Schlueter's use of the Bair Hugger, the Bair Hugger was being used for the purposes and in a manner normally intended, namely to warm patients during knee replacement surgery.

88. Defendants, with this knowledge, voluntarily designed its product in a dangerous condition for use by the public, and in particular, Plaintiff, Jill Schlueter.

89. Defendants created a product unreasonably dangerous for its normal, intended use.

90. Defendants created a product unreasonably dangerous for its normal, intended use.

91. Defendants designed, developed, researched, manufactured, tested, advertised, promoted, marketed, sold and/or distributed a defective product which created an unreasonable

risk to the health of consumers and to Plaintiff, Jill Schlueter, in particular, and Defendants are therefore strictly liable for the injuries sustain by Plaintiff.

92. Plaintiff could not, by the exercise of reasonable care, have discovered the Bair Hugger's defects herein mentioned and perceived its danger.

93. The Bair Hugger designed, developed, researched, manufactured, tested, advertised, promoted, marketed, sold and/or distributed by Defendants was defective due to inadequate warnings or instructions, as Defendants knew or should have known that the product created a risk of serious and dangerous side effects, as well as other severe and personal injuries which are permanent and lasting in nature and Defendants failed to adequately warn of said risk.

94. The Bair Hugger designed, developed, researched, manufactured, tested, advertised, promoted, marketed, sold and/or distributed by Defendants was defective due to inadequate warnings and/or inadequate testing.

95. The Bair Hugger designed, developed, researched, manufactured, tested, advertised, promoted, marketed, sold and/or distributed by Defendants was defective due to inadequate post-marketing surveillance and/or warnings because, after the Defendants knew or should have known of the risk of serious and dangerous side effects, including the contamination of the surgical site, as well as other severe and permanent health consequences from the Bair Hugger, they failed to provide adequate warning to users or consumers of the product, and continued to improperly advertise, market and/or promote the Bair Hugger.

96. By reason of the foregoing, Defendants have become strictly liable in tort to Plaintiff, Jill Schlueter, for the manufacturing, marketing, distribution and selling of a defective product, the Bair Hugger.

97. Defendants' defective design, manufacturing defect and inadequate warnings of the Bair Hugger were acts that amount to willful, wanton and/or reckless conduct by Defendants.

98. The defects in Defendants' Bair Hugger were a substantial factor in causing Plaintiff, Jill Schlueter's injuries.

99. As a result of the foregoing acts and omissions, Plaintiff, Jill Schlueter, suffered and will continue to suffer serious and permanent injuries, including limited mobility, as well as other severe and personal injuries, physical pain, mental anguish, diminished enjoyment of life and expenses for hospitalization.

### COUNT VII – ILLINOIS PRODUCTS LIABILITY ACT

100. Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

101. At all times relevant to this action, Defendants were engaged in the business of designing, developing, manufacturing, testing, packaging, promoting, marketing, distributing, labeling and/or selling the Bair Hugger.

102. At all times relevant to this action, the Bair Hugger was expected to reach, and did reach, consumers in the State of Illinois and throughout the United States, including Plaintiff, Jill Schlueter, herein without substantial change in the condition it was sold.

103. At all times relevant to this action, the Bair Hugger was designed, developed, manufactured, tested, packaged, promoted, marketed, distributed, labeled and/or sold by Defendants in a defective and unreasonably dangerous condition at the time it was placed in the stream of commerce in which ways include, but are not limited to, one or more of the following particulars:

    a. When placed in the stream of commerce, the Bair Hugger contained manufacturing defects which rendered the subject product unreasonably dangerous;

    b. The Bair Hugger's manufacturing defects occurred while the product was in the possession and control of Defendants;

      c.      The Bair Hugger was not made in accordance with Defendants' specifications of performance standards; and

      d.      The Bair Hugger's manufacturing defects existed before it left the control of Defendants.

104. The subject product manufactured and/or supplied by Defendants was defective in construction or composition in that, when it left the hands of Defendants, it deviated in a material way from Defendants' manufacturing performance standards and/or it deferred form otherwise identical products manufactured to the same design formula. In particular, the product is not safe and causes severe and permanent injuries. The product was unreasonably dangerous in construction or composition.

105. The subject product manufactured and/or supplied by Defendants was defective in design in that, an alternative design exists that would prevent severe and permanent injury. In particular, the development of body warming device without the effects of the Bair Hugger. The product was unreasonably dangerous in design.

106. The subject product manufactured and/or supplied by Defendants was unreasonably dangerous because Defendants did not provide an adequate warning about the product. At the time the subject product left Defendants' control, it possessed a characteristic that may cause damage, and Defendants failed to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handler of the product. The product is not safe and causes severe and permanent injuries. The product was unreasonably dangerous because of inadequate warning.

107. The subject product manufactured and/or supplied by Defendants was unreasonably dangerous because it did not conform to an express warranty made by Defendants regarding the product's safety and fitness for use. Defendants' express warranty regarding the subject product induced Plaintiff, Jill Schlueter, and Plaintiff's physicians to use the product, and

Plaintiff's damage was proximately caused because Defendants' express warranty was untrue. The product was unreasonably dangerous because of nonconformity to express warranty.

108. As a result of the foregoing acts and omissions, Plaintiff, Jill Schlueter, was caused to suffer severe and personal injuries, which are permanent and lasting in nature, physical pain, mental anguish, diminished enjoyment of life and financial expenses for hospitalization and medical care.

## COUNT VIII – LOSS OF CONSORTIUM

109. Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

110. Plaintiff's Spouse, Robert Schlueter, was all times relevant hereto the spouse of the Plaintiff, Jill Schlueter, and as such lives and cohabits with her.

111. For the reasons set forth herein, Plaintiff's Spouse has necessarily paid and has become liable to pay for medical aid, treatment and medications, and will necessarily incur further expenses of a similar nature in the future.

112. For the reasons set forth herein, Plaintiff's Spouse has been caused, presently and in the future, to suffer the loss of his spouse's companionship, services and society.

113. The ability of the Plaintiff' Spouse has in those respects been impaired and depreciated, and the marital association between husband and wife has been altered, and accordingly, Plaintiff and Plaintiff's Spouse have been caused great mental anguish.

114. Defendants' conduct, as described above, was extreme and outrageous. Defendants risked the lives of recipients of their products, including Plaintiff's, with knowledge of the safety and efficacy problems and suppressed this knowledge from the general public. Defendants made conscious decisions not to redesign, re-label, warn or inform the unsuspecting

recipients of Defendants' Defective Device. Defendants' outrageous conduct warrants an award of punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment against the Defendants, jointly and/or severally, as follows:

1. For an award of compensatory damages in excess of Seventy-Five Thousand Dollars ($75,000.00);

2. If allowed by the court upon motion, an award of punitive damages in the amount to be proved at the time of trial, and sufficient to punish the Defendants or to deter the Defendants and others from repeating the injurious conduct alleged herein;

3. For pre-judgment and post-judgment interest on the above general and special damages;

4. For costs of this suit and attorney's fees;

5. For all other relief that Plaintiffs may be entitled to at equity or at law; and

6. For such further and other relief that this Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all counts and issues so triable.

Date: April 27, 2016

        Respectfully submitted,

BY: /s/ Thomas J. Lech
Thomas J. Lech, IL Bar No. 6256261
GOLDENBERG HELLER
ANTOGNOLI & ROWLAND, P.C.
2227 South State Route 157
Edwardsville, IL 62025
Telephone: 618-656-5150
Facsimile: 618-656-6230
tlech@ghalaw.com
Attorneys for Plaintiffs